EFFIE ANNA HUNTER, Appellee, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

SEPTEMBER 28, 1928.

*Byron Clark, Jesse L. Root, J. W. Weingarten,* and *W. S. Lewis,* for appellant.

*C. E. Dean* and *Cook & Cook,* for appellee.

EVANS, J.—I. The first count of the petition claimed $150 as damages for the destruction of two acres of growing corn, and for injury to one other acre of growing corn. The alleged injury was caused on June 6, 1924, as the result of a heavy rainfall and alleged diversion of the water by the defendant upon the plaintiff's land. The second count was predicated upon a similar diversion, following a heavy rainfall on June 14, 1925. The alleged injury was suffered upon the same farm as that described in Count 1, and resulted, as alleged, in the destruction of eight acres of corn and one-half acre of potatoes, and in

other injury, to the damage of the plaintiff in the sum of $640. The discussion between the parties has taken a wide range, and has covered many subjects, some of which do not appear to us very pertinent. The real problem presented to us is to discover in the record some affirmative act of negligence or some failure of duty on the part of the defendant which could be deemed the efficient and proximate cause of the injury suffered by the plaintiff. The *locus quo* was upon the Missouri flats, at a place where there is no drainage, and no "fall" available for drainage purposes, and where the elevation was substantially that of the Missouri River. It was within an organized drainage district known as the "Pony Creek Drainage District." The improvement of this drainage district consisted in a shallow excavation of the purported stream, and in the construction of levees on its berms. Pony Creek in its natural condition was a variable and intermittent stream extending southerly toward the Missouri River, and extending from the foot of the highlands which skirt the Missouri flats on their easterly side. It was a shallow stream, which readily overflowed in times of heavy rainfall. Such overflows had no return to the creek after the subsidence of the flood, but they spread out over vast areas, and formed lakes and ponds. This creek was crossed by the defendant's railway, running east and west,—the crossing being substantially at right angles. Prior to 1902, the railway company carried its railway across this creek and the areas on either side thereof, on a trestle for a distance of 300 feet or more. Proceedings for the establishment of the Pony Creek Drainage District were begun in 1902, and the work was completed in 1904. The improvement contemplated and constructed pursuant to such proceedings was not a drainage project. The plan was to construct what may be termed an aqueduct, which should conduct the water coming from the highlands and confine the same within its banks, so as to prevent its spread over great areas. At its head, this aqueduct received the waters collected from a watershed of 8,000 acres of high lands. Levees were constructed on either side, to a height of four or five feet above the natural surface. It was sought thereby to conduct all the water from the upper sources within these levees to an outlet some distance south of the railroad and its trestle. The plan of the improvement had no

provision for any drainage of the areas contiguous to the stream or the levees. Pursuant to these proceedings (though denying their legal validity) the defendant-company abandoned its trestlework and built a bridge over the channel of the improvement, consisting of a single span 80 feet long, with a clearance of 7 feet above the ground. The distance between the levees was 50 feet. The improvement did not prove efficient. The channel filled up with silt. Clean-outs were ordered and had in 1908, 1916, and in 1923. In 1908, some changes were made in the plans. Pursuant to these, the defendant-company raised its bridge 1.6 feet, giving it a clearance of 8.45 feet. At the time of the construction of its bridge, in 1902, the defendant-company abandoned its trestlework, and substituted therefor an embankment, extending from each end of its bridge. The plaintiff's farm lies on the south side of the embankment and on the east side of the Pony Creek levee, and abuts upon each. It nestles in the angle made by the railroad embankment on its north side and the Pony Creek levee on its west side. The following diagram roughly indicates its location at Angle A:

Plaintiff's position in her litigation is somewhat unique. She averred that the defendant caused the waters to be dammed up, and thereby to be cast upon her. She averred that the bridge was the obstruction which so dammed the waters. Ordinarily it is an upper proprietor who complains of obstructed streams. She is not an upper proprietor. What happened was an extraordinary rainfall on each of the dates named in her petition,—June 6, 1924, and June 14, 1925. The collected waters from the hillsides of the upper area came down in such enormous volume as to submerge the railroad, with its embankment and its bridge. When the water rose to the level of the railroad, it necessarily overflowed, and escaped

in all directions. The contention of the plaintiff in argument is that, if the railroad bridge had been higher, so that the water could have passed under it, there would have been no overflow, and she would not have suffered thereby. In its final analysis, however, her complaint is that the railroad embankment was not high enough to protect her against the overflow. The plaintiff predicates her complaint against the defendant, not upon any specific conduct, nor upon any specific failure of duty, other than the negligence which may be implied from the mere fact that the plaintiff's embankment and bridge, as constructed, proved unavailing to confine the waters within the channel of Pony Creek. If this were a case where the defendant had obstructed a natural watercourse, so as to hold or divert water upon the land of another to his injury, it would be subject to liability therefor. This might fairly be termed a common-law liability. The mere fact that the waters were withheld and diverted would be evidence of the inadequacy of the provision made therefor. This is the theory upon which plaintiff has proceeded in this case. But her case is not of that kind. In such a case, there is a continuing duty upon the railroad company to keep open the watercourses with adequate openings. Failure to perform that duty is necessarily actionable. What was the duty resting upon the defendant in this case, as between it and the plaintiff? To answer this question, account must be taken of the organization of the drainage district. The organization of this district and the inclusion of the defendant and its right of way therein created a new status for the defendant. This organization was an exercise of the power of the state, and it laid its mandates upon the defendant. The defendant was not at liberty to ignore them nor to substitute its own judgment or discretion therefor. The organization of this district was had under the statutes then in force, which, so far as material herein, appear as Section 1989 *et seq.*, 1913 Supplement. Under these statutes, the property owners in a district had no control over the plan of the improvement. This was to be fixed by the board of supervisors, with the help and advice of a competent engineer. Every property owner became under legal duty to conform thereto. Section 1989-a18 defines the duty of a railroad company whose right of way is crossed by the proposed improve-

ment. This section provides that the county auditor shall serve written notice upon the railroad company, "stating the nature of the improvement to be constructed, the place where it will cross the right of way of such company, and the *full requirements* for its complete construction across such right of way as shown by the plans, specifications, plat and profile of the engineer appointed by the board, and directing such company to construct such improvement *according to said plans and specifications* at the place designated, * * * and upon receiving said notice it shall be the duty of such railroad company to construct the improvement across its right of way *according to the plans and specifications* furnished in said notice * * * if such railroad company shall fail, neglect or refuse to do so within the time fixed in said notice the auditor shall cause the same to be done under the supervision of the engineer in charge of the improvement and such railroad company shall be liable for the cost thereof to be collected by the county in any court having jurisdiction."

If, therefore, the railroad company responded to this demand upon it, it performed its full duty under the statute. If it failed to do so, the board of supervisors had power to carry out the improvement according to the plans, at the cost of the railroad company. In either event, the railroad company could not be deemed responsible for the plan. If the plan laid before it should prove to be impracticable and unworkable, the fault therefor could not be attributed to the railroad company or to any other property owner. So far as appears in this record, the defendant-company performed the requirements made upon it in such notice. If the cross section of the improvement was not large enough, or if the clearance was not high enough, the responsibility therefor was upon the superior authority. In any event, negligence may not be predicated by the plaintiff upon the mere fact that the improvement, as actually constructed according to plan, did not prove efficient in the emergency.

It appears from the evidence that, upon the construction of this improvement, more water flowed down Pony Creek than had ever done before. There was a clear tendency to an increase of flow in the successive years. The upper section of Pony Creek had a considerable fall in elevation, and the cur-

rent there was swift, and carried with it much silt brought down from the higher ground. Later in its course, and before it reached the defendant's right of way, the bed of the stream became flat. The loss of current precipitated the silt, and the channel filled up rapidly, and to such an extent that, for much of the distance, the bed of the stream was higher than much of the natural surface of the ground. Moreover, the swift running of the water from the upper level to the lower one caused the water to rise more rapidly where the current was slower.

In the first instance, as constructed in 1902 and 1903, the improvement consisted merely of waste banks, resulting from the work of excavation of the channel. The excavation was two or three feet deep. The engineer in charge was Dean, who was used as a witness by both sides, and who testified for the plaintiff as follows:

"There were waste banks on either side of the ditch: *in some places* dressed up to constitute levees; in others, wasted on the sides of the ditch."

The height of these waste banks was 4 or 5 feet. These waste banks were extended up to the right of way on either side. The right-of-way embankment was at that time about 7 feet high. In 1908, a clean-out was ordered by the board of supervisors; also, repair and improvement. The distance between the levee was extended by 50 feet. The material taken by excavation was piled up again as waste banks, to a higher elevation than before. At this time, the defendant-company raised its bridge 1.6 feet. What occurred in the building up of waste banks and levees was substantially repeated in 1916 and in 1923. Approximately 125,000 yards of dirt were taken out of the channel at each time. The waste banks forming the levees were piled up at irregular heights, ranging from 8 to 15 feet. The levees, crossing the right of way, consisted of the railroad embankment. This was approximately 8 feet. At other places, the waste banks were as high as 15 feet. It does not appear whether the board of supervisors fixed a definite elevation for the height of the levee. Manifestly, no levee, as such, could be higher than its lowest point. A short distance above the railroad bridge was a wagon bridge, where the level of the levee was substantially the same as at the rail-

road bridge. A similar condition existed 350 feet below the railroad bridge. Presumptively, this construction of the levee was not in violation of any order by the board. If it had been, the board had power and duty to correct it. The defendant's bridge rested on piers at each end. It had no intermediate supports. Its strength was provided for by steel girders.

On each of the dates in question, an extraordinary rainfall occurred. Each was sufficiently similar to the other that we need not describe them separately. One of the witnesses for the plaintiff measured 5 inches of rainfall in 25 minutes of time. There is considerable range in the testimony as to the extent of the rainfall, but it appears from that of many witnesses that in a very brief time there was a rainfall of approximately 10 inches.

Plaintiff argues that the steel girders operated as a dam, and obstructed the flow of the water, and caused it to rise higher above the bridge than below it. The material of a bridge necessarily operates as an obstruction *pro tanto*, whenever the level of the water reaches it. Up to that level, the bridge offered no interference. When the water reached that level, it reached also the level of the embankment. According to the testimony of some of plaintiff's witnesses, the water did in fact reach a level one foot higher than the top of the bridge. Irrespective of that, when the eight-foot level was reached, the water was bound to escape from Pony Creek. It did escape, and did run over the railway embankment in both directions, and necessarily found its way to the land of the plaintiff. Her land was low and flat, and without any provision for drainage. It was in that area which, prior to the construction of the improvement, was necessarily flooded by every overflow of Pony Creek. The construction of the improvement operated to her substantial protection in times of ordinary rainfall. Though she does not in terms base her complaint upon want of sufficient elevation of the levee and the embankment, yet such is the essence of it. If this was a deficiency, it inhered in the plan of the improvement. The dimensions of a drain or of a conduit are of the very essence of the plans and specifications thereof.

It does appear that the cross section under the bridge had been diminished by the accumulation of silt thereunder. Though

the clean-out of the ditch occurred in the summer of 1923, the clearing and excavation then made had all been rendered nugatory by the further deposit of silt before the month of June, 1924. The defendant-company had no responsibility for this. It was the natural and necessary result of the construction of the improvement as planned. If the defendant had interposed obstacles to, or interference with, the natural working of the improvement as planned and constructed, a different question would be presented.

At this point, the appellee cites and relies upon such cases as *Chicago & N. W. R. Co. v. Drainage Dist.*, 142 Iowa 607, and *Mason City & Ft. D. R. Co. v. Board of Supervisors*, 144 Iowa 10. In the latter case we said:

"The right of drainage through the natural watercourse is a natural easement appurtenant to the land of every individual through which it runs, and every owner of the land along such watercourse is obliged to take notice of the easement by others along the same. In constructing its embankment or culverts or bridges through it, the company does so subject to the right of the state by appropriate agencies to provide for such use of the natural watercourse as subsequently may become necessary and proper for public interests."

Also:

"Drainage, within the contemplation of the above statute, is for public use, convenience, and welfare (*Sisson v. Board of Supervisors of Buena Vista County*, 128 Iowa 442); and, this being so, the making of the improvement is within the police power of the state, and injury such as here claimed, being merely incidental thereto, cannot be regarded as the taking of property, within the contemplation of the Constitution. *Chicago, B. & Q. R. Co. v. People*, supra [200 U. S. 561]."

These cited authorities are not applicable at all to plaintiff's case. In these cases, the state was exercising its supreme authority through the agencies provided by statute, and the railway companies were challenging such exercise of power by the state, on the ground that it was in violation of the constitutional rights of such companies.

In the case at bar, the state did exercise its authority,

and through its proper agencies did plan and order and construct the improvement in question, and every landowner involved was bound to be obedient thereto.

Whether one landowner in a drainage district may, under any circumstances, sue another landowner in the same district for injuries resulting from the deficiency or limitation of the improvement constructed, we have no occasion now to determine. It is conceivable, in such a case, that an upper proprietor might suffer injury because the tile drain of the lower proprietor might prove inadequate to carry promptly away the water delivered from the upper land. Counsel would hardly suggest liability of the lower proprietor in such a case, even though the lack of capacity in the lower drain operated as a dam in checking the flow of water.

What we hold at this point is that, in ascertaining the nature and scope of the defendant's duty in relation to this watercourse, account must be taken of the fact that the state had asserted its supreme authority in the organization of the drainage district and in the construction of the improvement, and that the statutory duty thereby imposed upon the defendant became paramount and controlling.

Though the defendant was bound, under the statute, to construct the proposed improvement across its own right of way, and at its own expense, in the first instance, yet, both under the Constitution and under the statute, it was entitled to damages on account of such construction. Manifestly, it could not enlarge its claim for damages by constructing the improvement in larger dimensions than those laid before it. For like reason, it must be said, we think, that, in conforming to the plans adopted by the supreme authority, it cannot be deemed to have done so at its own peril.

As we have already indicated, no fact appears in this record which tends to establish any affirmative act of negligence or any omission of duty except that the improvement, as constructed, proved inadequate, on the particular extraordinary occasions, to protect the plaintiff. Such inadequacy does not constitute proof of negligence, either of the defendant or any other individual landowner in the district. The defendant's motion for a directed verdict should, therefore, have been sustained.

664

II. The abstract of appellant has not conformed to the rule requirements. The record is quite voluminous, and should have been carefully indexed. The evidence in the record was not indexed to any extent, except that the names of the witnesses were set forth alphabetically. Many exhibits were introduced, and are interspersed through the record. Not one of them was referred to in the purported index. This omission was partially atoned for by attaching an index to the brief, wherein the exhibits were included. But no suggestion was made anywhere to bring such index to our attention. The record is complicated, and we have been put to much additional labor by reason of the omission stated. We think the appellant should be penalized for the infraction noted. It will be ordered that no costs shall be taxed in this court for the appellant. For the reasons indicated in Division I hereof, the judgment of the district court is reversed.—*Reversed.*

All the justices concur.